**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA**
**CHARLESTON DIVISION**

COROTOMAN, INC.,

                 Plaintiff,

v.                                 CIVIL ACTION NO.   2:21-cv-00545

CENTRAL WEST VIRGINIA REGIONAL
AIRPORT AUTHORITY, INC., et al.,

                 Defendants.

**MEMORANDUM OPINION AND ORDER**

The Court has reviewed *Defendant L.R. Kimball & Associates, Inc.'s Renewed Motion to Dismiss Plaintiff's Amended Complaint* (Document 16), the attached *Defendant L.R. Kimball & Associates, Inc.'s Motion to Dismiss Plaintiff's Amended Complaint* (Document 16-1), *Defendant L.R. Kimball & Associates , Inc.'s Memorandum of Law in Support of Motion to Dismiss Plaintiff's Amended Complaint* (Document 16-2), the *Plaintiff's Opposition to Defendant L.R. Kimball & Associates, Inc's Motion to Dismiss* (Document 16-3; Document 38), and *Defendant L.R. Kimball & Associates, Inc.'s Reply in Support of Motion to Dismiss Plaintiff's Amended Complaint* (Document 16-4).   For the reasons stated herein, the Court finds that the motion to dismiss should be granted.

**PROCEDURAL HISTORY**

This matter was originally filed as an adversary proceeding in the Bankruptcy Court for the Southern District of West Virginia.   The Defendants initially filed motions to dismiss in that

1

proceeding.   This Court granted a motion to withdraw the reference to the bankruptcy court on September 24, 2021.   The Defendants then re-filed their motions to dismiss in this proceeding.

## FACTUAL ALLEGATIONS

In the mid-2000s, the Central West Virginia Regional Airport Authority, which operates Yeager Airport in Charleston, West Virginia, sought to expand its runway and improve conditions for takeoff and landing by removing a nearby knoll that created an obstruction.   The knoll was located approximately 4100 feet from the runway, and led to imposition of climb-out restrictions, including weight limits on certain flights and landing limitations on one runway during poor weather conditions.   In or around 2008, the Airport Authority began acquiring land in the Coal Branch Heights and Northgate area near the airport.   It needed approximately 39 acres, comprised of sixty separate properties, nine homes, and 3.8 acres of city streets, including property owned by Corotoman, Inc., a local development company owned by John Wellford.   The property owned by Corotoman included the obstructions and knoll that the Airport Authority wanted to remove, and the Airport Authority needed to acquire both some of the land owned by Corotoman and an avigation easement to permit aircraft to fly through some of Corotoman's airspace below 1250 feet above mean sea level.

The Airport Authority hired L.R. Kimball & Associates to assist with land purchases and provide constructions, engineering design, and administration services for the project.   Kimball's subcontractor, O.R. Colan, prepared an offer package, wherein the Airport Authority asserted its entitlement to Corotoman's land through condemnation.   The package was sent to Corotoman on February 24, 2011.   Corotoman disputed the value.   Rick Atkinson, the Director of Yeager Airport, and Bailey & Wyant, counsel for the Airport Authority, began negotiating a settlement of

the dispute with Corotoman, via Mr. Wellford and counsel.   In May 2011, Mr. Atkinson represented that the FAA would be "agreeable" to an arrangement whereby Yeager would be granted "a license to remove dirt from [the] property and purchase an 'air easement that would restrict the building height.'"   (Am. Compl. at ¶ 55, quoting emails att'd as Ex. B.)   Over the next months, Mr. Wellford and Mr. Atkinson "negotiated terms regarding the fair market value of the land and airspace and terms that would permit the Airport Authority to remove the knoll/obstructions, use some of Corotoman's airspace, yet also permit Corotoman to use the land development once the Airport Authority removed the knoll/obstruction."   (*Id.* at ¶ 59.)   They further negotiated an exchange of property, in the area owned by the Airport Authority, for other property owned by Corotoman, as well as the avigation easement.

During a meeting of the Board of Directors for the Airport Authority on or about October 26, 2011, Mr. Atkinson announced that the Airport Authority and Corotoman had reached an agreement.   The basic terms of the agreement were reported in the Charleston Gazette-Mail that day, along with a description of the knoll removal project, costs, and funding.   Negotiations continued into the spring of 2012.   An attorney for Corotoman sent a draft proposed Settlement Agreement to Charles (Chuck) Bailey of Bailey & Wyant on or about March 27, 2012.   The draft agreement "contained the material terms that there would be a license and work agreement in which the properties at issue would be overblasted below the planned final grade, there would be an exchange of property between Corotoman and the Airport Authority, a payment to Corotoman, and an Avigation Easement provided to the Airport Authority in exchange for the property transfers."   (*Id.* at ¶ 70.)   The proposed Settlement Agreement was addressed during an Airport Authority board meeting on March 28, 2012.   The meeting minutes noted the price for the

"easement and license agreement and property swap," funding from the FAA, and approval for Mr. Hill to sign "once the draft agreement was reviewed by legal counsel." (*Id.*at ¶72, quoting from Ex. E) (emphasis omitted.)   The parties and counsel continued exchanging drafts of the proposed agreement, and Mr. Bailey reviewed drafts and communicated with Mr. Atkinson and counsel for Corotoman regarding the agreement.

In late April, Mr. Bailey and Corotoman's counsel discussed liquidated damages to include in the agreement, and Corotoman's counsel noted some changes to the language regarding the clearance for the avigation easement.   After further negotiations, Corotoman's counsel sent a redlined version of the agreement with proposed changes to Mr. Bailey on May 9, 2012.   Mr. Bailey forwarded the proposed agreement to Mr. Atkinson that day.   He informed Corotoman's counsel that he would make a final review.   Mr. Bailey made no changes, and, on June 21, 2012, asked Corotoman's counsel to have Mr. Wellford sign on behalf of Corotoman and indicated he would have Mr. Atkinson sign the next day.   Mr. Atkinson signed the settlement agreement and had it notarized on or about June 22, 2012.   Mr. Wellford signed and notarized the agreement on or about July 5, 2012.

Mr. Atkinson and Mr. Bailey represented throughout the negotiation process that Mr. Atkinson had the authority to enter into the agreement on behalf of the Airport Authority, and Corotoman relied on that representation in presuming the Settlement Agreement was a valid contract.

The Settlement Agreement provided that Corotoman would "convey real property by General Warranty Deed to the Airport Authority, grant a license for work to be performed on property owned by Corotoman and grant an avigation easement to the Airport Authority." (*Id.* at

4

¶ 115.)   The Airport Authority, in turn, "agreed to perform certain work on Corotoman's real property in accordance with a License and Work Agreement, exchange real property with Corotoman and reimburse Corotoman for severance damages for the acquisition of property rights under the Settlement Agreement."   (*Id.* at ¶ 116.)   The License and Work agreement, also signed by Mr. Atkinson, detailed the specifics of the work to be performed on Corotoman's property, including requiring the Airport Authority to "overblast at least thirty-five (35) feet below the planned final grade" and complete a "finished grade…at least ten (10) feet below the elevation of the planned Avigation Easement at any point" on a specified area.   (*Id.* at ¶ 121 and 122.)   The agreement provided that the work would begin before the end of 2012 and be completed within twenty-four months thereafter.   Any breach would permit Corotoman to revoke the License and/or seek either actual damages or liquidated damages of $10,000 per breach.

The Settlement Agreement contemplated a Closing, at which properties would be transferred from Corotoman to the Airport Authority and from the Airport Authority to Corotoman as well as the recording of the Avigation Easement.   Corotoman was prepared for the Closing, but the Airport Authority was not, and it has never taken place.

Mr. Atkinson sent a letter to Kim Lewis at the Airport Authority on June 25, 2012, enclosing the Settlement Agreement and stating that Corotoman had provided the documentation necessary to process payment for $250,000.   At an Airport Authority board meeting on July 25, 2012, the Board noted payment of invoices, including to "Corotoman, Inc. $250,000 land acquisition/obstruction removal project."   (*Id.* at ¶ 133.)   The Board also approved a pay increase for Mr. Atkinson.   On September 18, 2013, the Airport Authority and Central Contracting, which submitted the lowest bid for the project, entered into an agreement for Central Contracting to

"identify, negotiate, permit and construct a waste area and remove the knoll and obstructions in the Coal Branch Heights/North Gate Area." (*Id.* at ¶ 140.) L.R. Kimball conducted a presentation to the Airport Authority on March 4, 2015, describing the project, progress and costs to date, and noting that "[t]he Airport Authority negotiated a Land-Use Agreement with Corotoman." (*Id.* at ¶ 146, quoting Ex. R.) (emphasis omitted.)

Dyno Nobel was a subcontractor for Central Contracting involved in the project. In 2013, 2014, and 2015, Kimball, Central Contracting, and Dyno Nobel entered Corotoman's land to perform work removing the obstruction and knoll. Construction began in September 2013, after the December 31, 2012 deadline for commencement of work contained in the License and Work Agreement. Blasting began on or about February 17, 2014, although it was supposed to begin in January 2014.

In or about early 2015, Corotoman learned that work had not been performed in compliance with the terms and conditions of the License and Work Agreement. The Airport Authority had not overblasted at least 35 feet below the planned final grade as specified in the Agreement and as necessary for Corotoman's use of the land. Mr. Wellford and Mr. Atkinson began negotiating a potential resolution.

On March 12, 2015, while negotiations were ongoing, "the safety area at the end of Runway 5 catastrophically failed sending hundreds of thousands of cubic yards of fill and other material down onto the Keystone Drive area of Charleston destroying homes a church, public roads and damming a stream." (*Id.* at ¶ 170.) Corotoman and the Airport Authority then began negotiating an "amendment to License and Work Agreement," a draft of which Mr. Bailey created on or about March 29, 2015. That draft Amendment provided for the Airport Authority to enter Corotoman's

6

property to remove rock and earth to stabilize the slope that had failed on Runway 5 and required the Airport Authority to insure that the finished grade in the area would be suitable for commercial development with a "final grade approximately thirty-five (35) feet lower than the planned final grade set forth in the License and Work Agreement and at least forty-five (45) feet below the elevation of the avigation easement." (*Id.* at ¶ 176.)   The draft Amendment further provided for a $3,500,000 settlement for the Airport Authority's failure to comply with the License and Work Agreement.   Although the Amendment was not signed by either Corotoman or the Airport Authority, the Airport Authority wrote a check to Corotoman for $60,000, signed by Mr. Atkinson, on or about May 29, 2015.   The Airport Authority wrote another check to Corotoman for $50,000, signed by Mr. Atkinson and another Airport official, on or about June 22, 2015.   "On or about June 26, 2015, pursuant to the terms of the payment contained in the draft Amendment to the License and Work Agreement, the Airport Authority wrote a check for three hundred ninety thousand dollars ($390,000) to Corotoman, signed by Atkinson and [Assistant Airport Director Terry] Sayre." (*Id.* at ¶ 183.   Corotoman received no further payments pursuant to the draft Amendment.   Mr. Atkinson resigned as Director of the Airport on or about July 20, 2015, and was replaced by Mr. Sayre, who was previously the Assistant Director.

In a September 4, 2015 letter, counsel for Corotoman sent a letter to Mr. Bailey, as counsel for the Airport Authority, notifying it that it had not completed work required by the Settlement Agreement or the License and Work Agreement, which would result in significant consequential damages.   Corotoman indicated a desire to work cooperatively to resolve the issue.   Mr. Wellford met with Mr. Hill, Chairman of the Board for the Airport Authority, to discuss a potential resolution.   However, during the same time frame in 2015 and 2016, Bailey & Wyant, Kimball,

and the Airport Authority were "conspiring to deprive Corotoman of the property and the use of the land as contemplated in the Settlement Agreement" and "to assert that Atkinson never had authority to enter into the Settlement Agreement with Corotoman." (*Id.* at ¶¶ 195-96.) Rick Holes with Kimball emailed the FAA, copying Mr. Sayre and another employee of the Airport Authority, on August 25, 2015, to suggest that the FAA could provide the Airport Authority with something it "could use to its advantage to gain ownership over the rest of the cut area, at a minimum, from Corotoman." (*Id.* at ¶197.)

Bailey & Wyant began investigating the events surrounding the execution of the agreements with Corotoman, including researching legal theories that could eliminate the 35-foot overblast requirement and research regarding Mr. Atkinson's authority. Corotoman was unaware of these efforts and continued negotiating with Bailey and Mr. Sayre to amend the Settlement Agreement and the License and Work Agreement. Corotoman and Bailey produced additional draft agreements in June 2016. The draft Amendments provided for a cash payment to compensate Corotoman for the Airport Authority's failure to perform the overblast work. On or about August 1, 2016, following continued communications with the FAA, Mr. Bailey sent a letter on behalf of the Airport Authority stating that the FAA would not approve the land agreement in exchange for the avigation easement, and the Airport Authority would seek to acquire the avigation easement without further consideration.

"To date, the Airport Authority has not performed the work as required by the License and Work Agreement or the Settlement Agreement" and "has not conveyed the real property to Corotoman as required by the Settlement Agreement." (*Id.* at 236–37.) It has "permitted

aircraft, including planes and helicopters, to fly through the airspace owned and controlled by Corotoman" without receiving an avigation easement.   (*Id.* at ¶ 250.)

Corotoman alleges the following causes of action: Count I: Breach of Contract – Settlement Agreement and License and Work Agreement, as to Airport Authority; Count II: Breach of Contract – Breach of Good Faith and Fair Dealing, as to Airport Authority; Count III: Breach of Quasi-Contract/Unjust Enrichment, pled in the alternative as to Airport Authority; Count IV: Declaratory Judgment, as to Airport Authority; Count V: Negligence, pled in the alternative as to Airport Authority; Count VI: Negligent Misrepresentation, pled in the alternative as to Airport Authority; Count VII: Fraud, as to Airport Authority; Count VIII: Civil Conspiracy, as to Airport Authority, Bailey & Wyant, and Kimball; Count IX: Tortious Interference with Contract, as to Bailey & Wyant and Kimball; and Count X: Trespass, pled in the alternative as to Airport Authority, Kimball, Central Contracting, and Dyno Nobel.

## STANDARD OF REVIEW

A motion to dismiss filed pursuant to Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim upon which relief can be granted tests the legal sufficiency of a complaint or pleading.  *Francis v. Giacomelli,* 588 F.3d 186, 192 (4th Cir. 2009); *Giarratano v. Johnson,* 521 F.3d 298, 302 (4th Cir. 2008).   Federal Rule of Civil Procedure 8(a)(2) requires that a pleading contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2).   Additionally, allegations "must be simple, concise, and direct." Fed. R. Civ. P. 8(d)(1).   "[T]he pleading standard Rule 8 announces does not require 'detailed factual allegations,' but it demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation."  *Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009) (*quoting Bell Atlantic Corp v. Twombly*,

550 U.S. 544, 555 (2007)).   In other words, "a complaint must contain "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555.   Moreover, "a complaint [will not] suffice if it tenders naked assertions devoid of further factual enhancements."   *Iqbal,* 556 U.S. at 678 (*quoting Twombly,* 550 U.S. at 557) (internal quotation marks omitted).

The Court must "accept as true all of the factual allegations contained in the complaint." *Erickson v. Pardus*, 551 U.S. 89, 93 (2007).   The Court must also "draw[ ] all reasonable factual inferences from those facts in the plaintiff's favor."   *Edwards v. City of Goldsboro*, 178 F.3d 231, 244 (4th Cir. 1999).   However, statements of bare legal conclusions "are not entitled to the assumption of truth" and are insufficient to state a claim.   *Iqbal,* 556 U.S. at 679.   Furthermore, the court need not "accept as true unwarranted inferences, unreasonable conclusions, or arguments."   *E. Shore Mkts., v. J.D. Assocs. Ltd. P'ship,* 213 F.3d 175, 180 (4th Cir. 2000). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice . . . [because courts] 'are not bound to accept as true a legal conclusion couched as a factual allegation.'"   *Iqbal,* 556 U.S. at 678 (quoting *Twombly,* 550 U.S. at 555).

To survive a motion to dismiss, "a complaint must contain sufficient factual matter, accepted as true, 'to state a claim to relief that is plausible on its face.'"   *Iqbal,* 556 U.S. at 678 (quoting *Twombly,* 550 U.S. at 570).   In other words, this "plausibility standard requires a plaintiff to demonstrate more than 'a sheer possibility that a defendant has acted unlawfully.'" *Francis,* 588 F.3d at 193 (quoting *Twombly,* 550 U.S. at 570).   A plaintiff must, using the complaint, "articulate facts, when accepted as true, that 'show' that the plaintiff has stated a claim entitling him to relief." *Francis,* 588 F.3d at 193 (quoting *Twombly,* 550 U.S. at 557).   "Determining whether a complaint

states [on its face] a plausible claim for relief [which can survive a motion to dismiss] will . . . be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Iqbal,* 556 U.S. at 679.

### DISCUSSION

Corotoman asserts claims of trespass, civil conspiracy, and tortious interference against Kimball.   Kimball argues that each claim should be dismissed.   It argues that the civil conspiracy and tortious interference claims fail because it was acting as an agent for the Airport Authority at all relevant times, and therefore could not conspire with it or tortiously interfere with its contract. It contends that there is no valid underlying tort claim to support the civil conspiracy allegation. Because the factual allegations against Kimball for the tortious interference claim are limited to emails sent to the FAA seeking support for the Airport Authority's efforts to gain property rights without fulfilling its obligations under the Settlement Agreement, Kimball argues that those emails were sent on behalf of and for the benefit of the Airport Authority.   In addition, it contends that the consultation with the FAA was justified by its role in the project, and that justification constitutes an affirmative defense that is apparent from the face of the complaint.   Kimball further argues that the amended complaint fails to adequately allege that its actions caused Corotoman any harm.   Finally, Kimball contends that the amended complaint does not state a claim for trespass because it does not allege a *nonconsensual* entry onto Corotoman's property, only that Corotoman may have been mistaken in believing a valid contract existed when it provided consent for entry.

Corotoman argues that if the Settlement Agreement was not valid, then the entry onto its property was without lawful authority and constitutes trespass.   It further argues that, to the extent

11

Kimball argues that it was an agent of the Airport Authority and therefore not susceptible to suit for tortious liability or civil conspiracy, Kimball should be considered an agent with knowledge of the Airport Authority's position regarding the validity of the Settlement Agreement.  Corotoman next argues that whether Kimball was an agent of the Airport Authority is a question of fact. Therefore, it argues that the motion to dismiss the civil conspiracy claim on the basis that Kimball was the Airport Authority's agent should be denied.   It argues that the precedent stating that agents cannot conspire with the principal involve an employment relationship, rather than separate corporate entities, and so Kimball's status as an agent should not be presumed.   Similarly, Corotoman argues that Kimball is a party outside the contractual relationship between the Airport Authority and Corotoman, and therefore may be liable for tortious interference.   Finally, it argues that Kimball's affirmative defense that it was justified in its communications with the FAA is not established by the allegations contained in the amended complaint, and therefore should be denied.

### A.  Trespass

The Court previously found that the Settlement Agreement and License and Work Agreement are valid contracts.  (*See* Mem. Op., Document 71, granting motion for partial summary judgment.)   Corotoman's trespass claim is pled in the alternative, asserting that *if* the contract were invalid, entry onto its property constituted trespass.   Because the Court has found the contract to be valid, the trespass claim against Kimball is moot.[1]

---

1 The Court found that the trespass claim with respect to Dyno Nobel and Central Contracting would be subject to dismissal even absent the finding regarding the validity of the Settlement Agreement because the amended complaint states that Corotoman consented to the entry onto its property.  Consent is not a defense in certain circumstances, including when the party seeking to use it as a defense obtained the consent through misrepresentations, under some circumstances.  *See, Food Lion, Inc. v. Cap. Cities/ABC, Inc.*, 194 F.3d 505, 517–519 (4th Cir. 1999) (discussing the validity of consent obtained through misrepresentation in various circumstances).   Kimball is not in the same position as Dyno Nobel and Central Contracting because the amended complaint alleges that it was involved in efforts to obtain Corotoman's property for the Airport Authority without complying with the terms of the Settlement Agreement, and would therefore have known that Corotoman's consent was based on a mistaken belief that both parties intended to

### B.  Tortious Interference

The West Virginia Supreme Court of Appeals has established the following elements for a plaintiff to set forth a prima facie case for tortious interference with a contract or business relationship: "(1) the existence of a contractual or business relationship or expectancy; (2) an intentional act of interference by a party outside that relationship or expectancy; (3) proof that the interference caused the harm sustained; and (4) damages."  Syl. Pt. 5, *Hatfield v. Health Mgmt. Assocs. of W. Virginia*, 672 S.E.2d 395, 398 (W. Va. 2008).   Further, "[i]t is impossible for one party to a contract to maintain against the other party to the contract a claim for tortious interference with the parties' own contract."  *Id.* at Syl. Pt. 6.

The allegations in the first amended complaint involve conduct and communications that Kimball undertook in its role as a contractor overseeing the obstruction removal project for the Airport Authority.  It sent emails to the FAA in 2015 and 2016, seeking FAA assistance in the Airport Authority's efforts to gain ownership of Corotoman's property without fulfilling the terms of the Settlement Agreement and seeking the FAA's position on various proposals for easements and/or land exchanges that would require FAA approval.  Those emails detailed coordination between Rick Holes of Kimball and management staff at the Airport.  The content related exclusively to the Airport Authority's interests.  Nothing in the amended complaint leads to a reasonable inference that Kimball was acting on its own behalf or acting without consultation with the Airport Authority.  The amended complaint fails to state a claim against Kimball for tortious interference because it does not allege that Kimball was acting as a party outside the contractual relationship.  The factual allegations, drawing permissible inferences in favor of Corotoman, do

---

comply with the agreement.

13

not support any interpretation except that Kimball's actions were taken in its capacity as an agent of the Airport Authority. Therefore, the Court finds that Kimball's motion to dismiss must be granted as to Count Nine.

### C. Civil Conspiracy

Under West Virginia law, a civil conspiracy constitutes "two or more persons by concerted action to accomplish an unlawful purpose or to accomplish some purpose, not in itself unlawful, by unlawful means. The cause of action is not created by the conspiracy but by the wrongful acts done by the defendants to the injury of the plaintiff." Syl. Pt. 8, *Dunn v. Rockwell*, 689 S.E.2d 255, 259 (W. Va. 2009). It "is not a *per se*, stand-alone cause of action; it is instead a legal doctrine under which liability for a tort may be imposed on people who did not actually commit a tort themselves but who shared a common plan for its commission with the action perpetrator(s)." *Id.* at Syl. Pt. 9. "Courts have granted summary judgment or dismissal as to claims of civil conspiracy when there is no underlying tort to support the claim." *Bennett v. Skyline Corp.*, 52 F.Supp.3d 796, 814 (N.D. W. Va. 2014); *see also Webb v. Paine*, 515 F. Supp. 3d 466, 487 (S.D.W. Va. 2021) (Copenhaver, S.J.) (granting partial summary judgment on civil conspiracy claim after finding summary judgment appropriate as to underlying tort of tortious interference, although claim survived as to other potential underlying torts).

Because tortious interference and trespass are the only underlying torts alleged against Kimball, and the Court has found that neither claim may proceed, the civil conspiracy claim must also be dismissed. Having found that the amended complaint failed to state a claim for either tortious interference or civil conspiracy, the Court finds it unnecessary to address the other arguments made to support the motion(s) to dismiss.

14

**CONCLUSION**

Wherefore, after thorough review and careful consideration, the Court **ORDERS** that *Defendant L.R. Kimball & Associates, Inc.'s Renewed Motion to Dismiss Plaintiff's Amended Complaint* (Document 16) be **GRANTED**, that Counts Eight and Nine be **DISMISSED** without prejudice, and that Count Ten be **DISMISSED** without prejudice as moot.

The Court **DIRECTS** the Clerk to send a copy of this Order to counsel of record and to any unrepresented party.

ENTER:     February 25, 2022

IRENE C. BERGER
UNITED STATES DISTRICT JUDGE
SOUTHERN DISTRICT OF WEST VIRGINIA

15