IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

CHARLESTON DIVISION

COROTOMAN, INC.,

                Plaintiff,

v.                                                CIVIL ACTION NO.   2:21-cv-00545

CENTRAL WEST VIRGINIA REGIONAL
AIRPORT AUTHORITY, INC., et al.,

                Defendants.

**MEMORANDUM OPINION AND ORDER**

The Court has reviewed *Defendant Central West Virginia Regional Airport Authority's Motion for Summary Judgment* (Document 146), *Defendant Central West Virginia Regional Airport Authority's Memorandum in Support of Its Renewed Motion for Summary Judgment* (Document 147), the *Memorandum in Opposition to Central West Virginia Regional Airport Authority, Inc.'s Memorandum in Support of Its Motion for Summary Judgment* (Document 155), and *Defendant Central West Virginia Regional Airport Authority's Reply in Support of Its Motion for Summary Judgment* (Document 159), as well as all attached exhibits.

The Court has also reviewed Plaintiff Corotoman's *Motion for Partial Summary Judgment for Breach of Contract and Specific Performance Against Central West Virginia Regional Airport Authority, Inc.* (Document 148), the *Memorandum in Support of Motion for Partial Summary Judgment for Breach of Contract and Specific Performance Against Central West Virginia Regional Airport Authority, Inc.* (Document 149), *Defendant Central West Virginia Regional*

*Airport Authority's Response in Opposition to Corotoman's Motion for Partial Summary Judgment on Breach of Contract and Specific Performance* (Document 156), and the *Reply Memorandum in Support of Corotoman's Memorandum in Support of Its Motion for Partial Summary Judgment on Breach of Contract and Specific Performance* (Document 158), as well as all attached exhibits.

**FACTS**

The Plaintiff, Corotoman, Inc., is a development company that owned property in the vicinity of Yeager Airport in Charleston, West Virginia. Its president is John Wellford. The Central West Virginia Regional Airport Authority (Airport Authority) operates Yeager Airport. It is governed by a Board of Directors, while an airport director manages day-to-day operations. The President of the Board of Directors at all relevant times was R. Edison Hill. Richard Atkinson was the airport director from 1999 through July 2015. At all times relevant to the instant motions, the Airport Authority was represented by Charles (Chuck) Bailey and his firm of Bailey & Wyant as outside counsel.

This suit was originally filed as an adversary proceeding in Corotoman's bankruptcy case in the Bankruptcy Court for the Southern District of West Virginia. (2:19-BK-20134; 2:19-AP-2013.) The Court granted a motion to withdraw the reference on September 24, 2021. (Mem. Op., Document 9 in 2:21-mc-120.) The Court previously entered several opinions, dismissing some defendants and granting partial summary judgment to Corotoman on the issue of contract formation.

The Airport Authority sought to remove a knoll located on property near the airport because it interfered with certain flights. It obtained a grant from the FAA and contracted with

2

L.R. Kimball & Associates to assist in the project, including acquiring the parcels of property. Corotoman was the largest single property owner in the obstruction removal area. Beginning in 2011, Mr. Atkinson engaged in negotiations with Mr. Wellford of Corotoman, seeking to purchase the Corotoman properties on behalf of the Airport Authority. Mr. Atkinson informed the Board of the ongoing negotiations. By late March 2012, they had negotiated a draft Settlement Agreement, which Mr. Atkinson presented to the Board on March 28, 2012. The Board minutes reflect a brief description of the terms of the agreement, noting a price of $350,000 for an easement and license agreement and property swap. The Board authorized the Chairman, Mr. Hill, to sign the agreement pending approval of counsel.

The Settlement Agreement provided for execution of a related License and Work Agreement with detailed requirements related to the work to be performed on the property. The draft version of the License and Work Agreement at the time of the March 28, 2012 board meeting contained a provision requiring the Airport Authority to overblast[1] in the area of the avigation easement. Mr. Bailey and counsel for Corotoman negotiated a number of changes, and the final version of the License and Work Agreement changed the overblast requirement from a 20-foot overblast to a 35-foot overblast. Corotoman also added language requiring that the final grade be at least 10 feet below the elevation of the planned avigation easement. Neither Mr. Atkinson nor Mr. Bailey had a full understanding of the meaning of the term "overblast," and neither took any steps to ascertain the practicality or costliness of performing the overblast requirement. There is no indication that Mr. Atkinson or Mr. Bailey provided the draft documents to members of the

---

1 Overblasting requires drilling and blasting below the planned elevation to loosen the soil.

Board or that any member of the Board requested or reviewed the documents, either before or after the March 28, 2012 meeting.

On June 21, 2012, Mr. Bailey told Corotoman's counsel to have Mr. Wellford sign the draft Settlement Agreement and indicated that Mr. Atkinson would sign on behalf of the Airport Authority the next day. Mr. Atkinson signed the Settlement Agreement as Airport Director on June 22, 2012, and his signature was notarized by a Bailey & Wyant employee.[2] He also signed the License and Work Agreement on July 5, 2012, and it contains the notary stamp of April Payne, an Airport Authority employee. Mr. Wellford signed both documents and had his signature notarized on July 5, 2012.

Section Two of the Settlement Agreement, titled "Nature of Agreement," outlines the contours of the agreement:

> [I]n lieu of condemnation, Corotoman agrees to grant a license for certain work to be performed on certain real property currently owned by Corotoman and to grant an easement for the passage of aircraft over certain real property. As fair and just compensation for said rights, including severance damages to Corotoman's remaining property rights, the Airport Authority agrees to perform certain work on certain real property owned by Corotoman, exchange certain other real property with Corotoman, and reimburse Corotoman for the severance damages caused by the Airport Authority's acquisition of property rights under this Settlement Agreement."

(Pl.'s Ex. A, Settlement Agreement at § 2) (Document 148-2.) Section 3.01 provides for execution of the License and Work Agreement and requires that the "Project shall be completed

---

2 Although the Board authorized Mr. Hill, rather than Mr. Atkinson, to sign the Settlement Agreement, the Court previously found that fact irrelevant to the validity of the contract, given that the Board approved the contract, conditional on attorney review, Mr. Hill did not review contracts he signed as Chairman of the Board and was unaware he had not signed it until years later, the Airport Authority delegated all negotiations and communications regarding the contract to Mr. Atkinson and Mr. Bailey, and the Airport Authority proceeded to bid out and perform the project that was dependent on the existence of a valid contract between Corotoman and the Airport Authority.

in strict accordance with the Grading and Construction Plans, Specifications, and Schedules" attached to the Agreement. (*Id.* at § 3.01.) Sections 3.02 and 3.03 provide for the conveyance of properties described in exhibits to the Agreement to the respective parties. Section 3.04 requires Corotoman to grant the Airport Authority an avigation easement "[c]ontingent upon the exchange of real property set forth in Paragraphs 3.02 and 3.03." (*Id.* at § 3.04.) Section Four provided for execution and delivery of the deeds and avigation easement at a Closing to occur within 60 days of execution of the Settlement Agreement. Section 7.07 contains a force majeure clause providing for the extension of time during certain delays or hindrances and contains the parties' agreement that "[i]n no event shall financial inability or acts or omissions within the control of the party seeking an excuse or extension be a cause for excuse or extension hereunder." (*Id.* at § 7.07.) Section 7.08 provides: "Each party shall perform all obligations required by it under this Settlement Agreement only after obtaining all required governmental licenses, permits, and approvals, and thereafter in compliance with all such licenses, permits, and approvals, and otherwise in compliance with all applicable constitutional provisions, laws, rules, regulations, and directives of authorities of competent jurisdiction." (*Id.* at § 7.08.) Section 7.09 consists of a severability provision.

   The License and Work Agreement includes specific terms related to the work to be performed, including when work was to commence and be completed, the language regarding the overblast and final grade for the property at completion, and other provisions on insurance, stormwater retention and control, and the parties' respective rights and obligations. Paragraph 15, entitled "Effect of Breach" provides as follows:

> Failure by the Airport Authority to strictly abide by the terms and
> conditions set forth in this Work Agreement shall constitute a

5

> material breach of the Agreement. Failure to timely commence the Project shall terminate this Work Agreement and entitle Corotoman to retain any payments due and payable under the Settlement Agreement. The parties acknowledge that any breach by the Airport Authority occurring after commencement of the Project will cause significant harm to Corotoman, including lost profits, revenue, and rents; loss of the use of Corotoman's property; potential third-party litigation costs, including attorney's fees and court costs; and annoyance and inconvenience. Therefore, in event of a breach occurring after commencement of the Project, Corotoman may, in its discretion and as the circumstances reasonably dictate, revoke the License granted herein and/or seek the greater of either (1) actual compensatory, consequential, and/or incidental damages or (2) liquidated damages in the amount of ten thousand dollars ($10,000) per breach. These remedies are cumulative, and a waiver, release, or settlement of one breach shall not operate as a waiver, release, or settlement of any other breach. Notwithstanding anything in this Paragraph to the contrary, Corotoman shall release the Airport Authority from any and all liability for liquidated damages if the Airport Authority requires all of its contractors and subcontractors to pay directly to Corotoman, as a third-party beneficiary, any liquidated damages caused by the acts or omissions of that contractor or subcontractor. Notwithstanding any breach by either party of this Work Agreement, the Settlement Agreement shall remain in force and effect to the fullest extent possible. Failure to complete the Project contemplated by this Work Agreement shall not affect the provisions of the Settlement Agreement regarding mutual release of prior claims and future condemnation of Corotoman's real property.

(License and Work Agreement at ¶ 15) (Document 148-2.)

Although it is referenced in both the Settlement Agreement and in the License and Work Agreement, the Grading and Construction Plans, Specifications, and Schedules did not include the overblast work. Corotoman reviewed those plans but did not raise concerns regarding the overblast until after the knoll removal work was partially completed. The obstruction removal project opened for bids on July 24, 2012, but had to be re-bid and did not begin until sometime in 2013, after Central Contracting was awarded the contract.

The overblast would have taken place after the initial blasting and fill removal resulted in the grade required for the avigation easement. Additional drilling and blasting to the overblast depth would then loosen the material. Mr. Wellford spoke with Steve Cvechko of Central Contracting about the overblast when the project was partially complete and was informed that it was not part of the plans. Mr. Atkinson and Mr. Cvechko also spoke regarding the potential overblast, and Mr. Cvechko noted that it would be expensive, that it risked damage to large gas and water lines, and that there could be blasting claims for damage to nearby homes, as well as slides and/or drainage issues. (Cvechko Depo. at 57:14–58:23) (Document 148-20.) Corotoman sought to negotiate a resolution with Mr. Atkinson in early 2015, prior to completion of the project. Mr. Atkinson left the Airport Authority in July 2015. The parties did not successfully negotiate a resolution, and the Airport Authority never performed the overblast requirement. The obstruction removal project was completed around November 2015, and negotiations continued between Corotoman and the airport director who replaced Mr. Atkinson.

The property transfers and conveyance of the avigation easement also did not occur, although the Airport Authority has utilized the airspace since completing the obstruction removal project. In a letter dated August 1, 2016, and signed by Mr. Bailey, the Airport Authority informed Corotoman's counsel that the FAA had refused to approve the proposed land exchange and would not consider approving such an exchange until after an avigation easement was recorded. (Aug. 1, 2016 Letter, att'd as Pl.'s Ex. BB) (Document 148-29.)

## STANDARD OF REVIEW

The well-established standard in consideration of a motion for summary judgment is that "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as

to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a)–(c); *see also Hunt v. Cromartie*, 526 U.S. 541, 549 (1999); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986); *Hoschar v. Appalachian Power Co.*, 739 F.3d 163, 169 (4th Cir. 2014). A "material fact" is a fact that could affect the outcome of the case. *Anderson*, 477 U.S. at 248; *News & Observer Publ'g Co. v. Raleigh-Durham Airport Auth.*, 597 F.3d 570, 576 (4th Cir. 2010). A "genuine issue" concerning a material fact exists when the evidence is sufficient to allow a reasonable jury to return a verdict in the nonmoving party's favor. *FDIC v. Cashion*, 720 F.3d 169, 180 (4th Cir. 2013); *News & Observer*, 597 F.3d at 576.

The moving party bears the burden of showing that there is no genuine issue of material fact, and that it is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *Celotex Corp.*, 477 U.S. at 322–23. When determining whether summary judgment is appropriate, a court must view all of the factual evidence, and any reasonable inferences to be drawn therefrom, in the light most favorable to the nonmoving party. *Hoschar*, 739 F.3d at 169. However, the nonmoving party must offer some "concrete evidence from which a reasonable juror could return a verdict in his favor." *Anderson*, 477 U.S. at 256. "At the summary judgment stage, the non-moving party must come forward with more than 'mere speculation or the building of one inference upon another' to resist dismissal of the action." *Perry v. Kappos*, No.11-1476, 2012 WL 2130908, at *3 (4th Cir. June 13, 2012) (unpublished decision) (quoting *Beale v. Hardy*, 769 F.2d 213, 214 (4th Cir. 1985)).

In considering a motion for summary judgment, the court will not "weigh the evidence and determine the truth of the matter," *Anderson*, 477 U.S. at 249, nor will it make determinations of

8

credibility. *N. Am. Precast, Inc. v. Gen. Cas. Co. of Wis.*, 2008 WL 906334, *3 (S.D. W. Va. Mar. 31, 2008) (Copenhaver, J.) (citing *Sosebee v. Murphy,* 797 F.2d 179, 182 (4th Cir. 1986). If disputes over a material fact exist that "can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party," summary judgment is inappropriate. *Anderson*, 477 U.S. at 250. If, however, the nonmoving party "fails to make a showing sufficient to establish the existence of an element essential to that party's case," then summary judgment should be granted because "a complete failure of proof concerning an essential element . . . necessarily renders all other facts immaterial." *Celotex*, 477 U.S. at 322–23.

When presented with motions for summary judgment from both parties, courts apply the same standard of review. *Tastee Treats, Inc. v. U.S. Fid. & Guar. Co.*, 2008 WL 2836701 (S.D. W. Va. July 21, 2008) (Johnston, J.) *aff'd,* 474 F. App'x 101 (4th Cir. 2012). Courts "must review each motion separately on its own merits to determine whether either of the parties deserves judgment as a matter of law," resolving factual disputes and drawing inferences for the nonmoving party as to each motion. *Rossignol v. Voorhaar*, 316 F.3d 516, 523 (4th Cir. 2003) (internal quotation marks and citations omitted); *see also Monumental Paving & Excavating, Inc. v. Pennsylvania Manufacturers' Ass'n Ins. Co.*, 176 F.3d 794, 797 (4th Cir. 1999).

## DISCUSSION

Corotoman argues that it is entitled to summary judgment on the issue of breach of contract because the undisputed facts demonstrate that the Airport Authority breached the Settlement Agreement by failing to complete the overblast and land swap. It contends that no valid defenses excuse the Airport Authority's breach. Corotoman also requests that the Court compel the Airport Authority "to specifically perform its obligations by 1) transferring the properties at issue; and 2)

performing the 35-foot overblast." (Corotoman Mem. at 18) (Document 149.) It argues that specific performance is appropriate in this case because the contract involved real property and both parties are sophisticated.

The Airport Authority, on the other hand, argues that it is entitled to summary judgment. It contends that the land exchange is not required because the FAA refused to approve it, and there was no meeting of the minds regarding the overblast requirement. Alternatively, it argues that there was a mutual mistake of fact related to the overblast requirement based on the cost of the project in relation to the value of the land. It further argues that Corotoman waived its right to enforce the overblast provision because it did not object to the Grading and Construction Plans that omitted overblasting and did not raise the issue until after work on the Project was nearly complete. Finally, it argues that Corotoman has not presented evidence of damages.

### A. Breach

Under West Virginia law, a breach of contract claim requires proof of the following elements: "the existence of a valid, enforceable contract; that the plaintiff has performed under the contract; that the defendant has breached or violated its duties or obligations under the contract; and that the plaintiff has been injured as a result." *Hardiman v. Elahs Indus., LLC*, No. CV 3:15-13282, 2016 WL 2745855, at *1 (S.D.W. Va. May 11, 2016) (Chambers, J.) (quoting *Exec. Risk Indem., Inc. v. Charleston Area Med. Ctr., Inc.*, 681 F. Supp. 2d 694, 714 (S.D.W. Va. 2009) (Goodwin, C.J.)). It is an elementary principle of contract law that courts must give effect to the written terms of a contract that unambiguously express the intent of the parties. 11 Williston on Contracts § 30:6 (4th ed.). "A valid written instrument which expresses the intent of the parties in plain and unambiguous language is not subject to judicial construction or interpretation but will

be applied and enforced according to such intent." *Zimmerer v. Romano*, 679 S.E.2d 601, 610 (W. Va. 2009) (quoting Syl. pt. 1, *Cotiga Development Company v. United Fuel Gas Company*, 128 S.E.2d 626 (W. Va. 1963)).

The Court previously found that the Settlement Agreement and accompanying License and Work Agreement was a valid, enforceable contract. There is no dispute that Corotoman performed by permitting the Airport Authority to enter its property and remove the knoll, or that the Airport Authority has utilized the airspace following completion of the obstruction removal project. Likewise, there is no dispute that the Airport Authority did not complete the overblasting or the land swap set forth in the Settlement Agreement and accompanying materials. Corotoman has been injured because its property is no longer useable, it did not gain the function that would have been achieved through the overblast requirement, and it did not gain the properties contemplated by the land swap.

The dispute surrounding the breach of contract claim centers on whether the contract required performance of the overblast provision and the land swap, and whether any defense exists. The Airport Authority argues that it was not required to perform the land swap because Section 7.08 of the Settlement Agreement provides that "[e]ach party shall perform all obligations required by it under this Settlement Agreement only after obtaining all required governmental licenses, permits, and approvals," and the FAA did not approve the property exchange. The Court, like Corotoman, reads that provision to require the parties to obtain the necessary approvals prior to performance of "all obligations," including the obstruction removal project. In other words, the Airport Authority was required to gain the FAA approval necessary for the land swap prior to entering Corotoman's property, removing the knoll, and utilizing the air space. The contract

11

language does not support the Airport Authority's attempt, after obtaining all the benefits of the bargain, to escape any obligation to perform the land swap based on the FAA's refusal to approve it.

The Airport Authority also contends that the overblast provision should not be enforced because it was not presented to the Board of Directors, overblasting was not included in the construction plans, and it would be impracticable. The language in the License and Work Agreement provides that "[t]he Airport Authority agrees to overblast at least thirty-five (35) feet below the planned final grade, on drill dates and blasting plan acceptable to Corotoman and as otherwise outlined in the Grading and Construction Plans, Specifications, and Schedules." (License and Work Agreement at ¶ 5) (Document 148-2.) Despite the failure to include the overblast in the subsequent Grading and Construction Plans, the overblast requirement is unambiguous. As the Court discussed in more detail in the previous opinion granting partial summary judgment on the issue of contract formation, the Board delegated authority to Mr. Atkinson and Mr. Bailey to negotiate the contract, approved the broad terms without reading the contract, and proceeded to bid out the obstruction removal project, which was dependent upon the existence of a valid contract. The Airport Authority cannot retroactively invalidate contract terms because the Board members did not read the contract, before or after the relevant changes, and now question the judgment of Mr. Atkinson and Mr. Bailey in accepting those terms. Likewise, failure to investigate the cost of performing the contractual obligations prior to entering into the contract does not excuse performance. The terms of the contract clearly required a 35-foot overblast and the exchange of properties. Thus, the undisputed facts establish that the Airport Authority breached the terms of the contract.

The Airport Authority asserts various defenses, including mutual mistake, impracticability, and laches. The analysis for mutual mistake and impracticability is overlapping in this case, as both defenses are based on the high cost of performing the overblast. "A mutual mistake is one which is common to all parties, wherein each labors under the same misconception respecting a material fact or provision within the agreement." Syl. Pt. 2, *Ryan v. Ryan*, 640 S.E.2d 64, 65 (W. Va. 2006). "A contract may not be reformed or rescinded based upon a mutual mistake of fact if the mistake relates to a mistaken belief, judgment, or expectation as to future, rather than past or present, facts, occurrences or events." *Id.* at Syl. Pt. 3. The West Virginia Supreme Court established the following standard regarding impracticability as a defense to contract performance:

> Under the doctrine of impracticability, a party to a contract who claims that a supervening event has prevented, and thus excused, a promised performance must demonstrate each of the following: (1) the event made the performance impracticable; (2) the nonoccurrence of the event was a basic assumption on which the contract was made; (3) the impracticability resulted without the fault of the party seeking to be excused; and (4) the party has not agreed, either expressly or impliedly, to perform in spite of impracticability that would otherwise justify his nonperformance.

Syl. Pt. 1, *Gaddy Eng'g Co. v. Bowles Rice McDavid Graff & Love, LLP*, 746 S.E.2d 568, 570 (W. Va. 2013).

As Corotoman points out, it was under no misconception regarding the cost of the overblast requirement because it had no need to assess those costs, which were to be borne by the Airport Authority. The Airport Authority did not inquire about the potential costs until Corotoman asked about the overblasting after the project was partially completed, well after the contract was signed.[3]

---

3 Nothing in the record suggests the Airport Authority assessed the cost of the 20-foot overblast requirement that was in the draft version of the contract in circulation at the time the Board approved the contract pending attorney review. Thus, the change to a 35-foot requirement has little impact on the analysis of any potential mistake by the Airport Authority.

The expense involved in safely satisfying the overblast requirement likewise cannot be considered a supervening event, the nonoccurrence of which was a basic assumption of the contract. Furthermore, the Settlement Agreement expressly provides that "[i]n no event shall financial inability…be a cause for excuse or extension." (Settlement Agreement at § 7.07.) Therefore, neither mutual mistake nor impracticability constitute valid defenses to performance.

Laches is a defense available "where a party knows his rights or is cognizant of his interest in a particular subject matter but takes no steps to enforce the same until the condition of the other party has, in good faith, become so changed, that he cannot be restored to his former state if the right be then enforced." Syl. Pt. 2, *Mundy v. Arcuri*, 267 S.E.2d 454, 455 (W. Va. 1980). "[O]ne who seeks to assert the defense of laches must show (1) lack of diligence by the party against who the defense is asserted, and (2) prejudice to the party asserting the defense." *State, Dep't of Health & Hum. Res., Child Advoc. Off. on Behalf of Robert Michael B. v. Robert Morris N.*, 466 S.E.2d 827, 830 (W. Va. 1995) (internal quotation marks omitted).

There is no dispute that the overblast work was omitted from the initial construction plans. There is also no dispute that Corotoman raised the issue before the obstruction removal project was complete, while the contractor was still performing removal work on site. The Airport Authority argues that "[a]t that point, nothing could be done" because it could not realistically "return Corotoman's property to its original condition." (AA Resp. at 17) (Document 156.) But Corotoman raised the issue before the point that the overblasting work would have taken place. The Airport Authority cannot show a lack of diligence on the part of Corotoman, given that Corotoman negotiated the inclusion of the overblast provision in the contract and inquired about it during the obstruction removal project. The Airport Authority is also unable to show prejudice.

14

Although objecting to the initial construction plans could have ensured inclusion of the overblast work in the plans and initial budget, overblasting was already required by the unambiguous language of the License and Work Agreement, and Corotoman sought to enforce the overblasting requirement at a point that it could have still been incorporated into the project. There is no evidence that Central Contracting would have had to redo work, recall equipment, or otherwise perform additional work due to the timing of Corotoman's inquiry regarding the overblasting provision.

  A similar analysis applies to the Airport Authority's argument that Corotoman waived the right to have the overblast work performed. Waiver does not require a showing of prejudice or detrimental reliance by the party asserting waiver, but instead "focuses on the conduct of the party against whom waiver is sought, and requires that party to have intentionally relinquished a known right." Syl. Pt. 2, *Parsons v. Halliburton Energy Servs., Inc.*, 785 S.E.2d 844, 848 (W. Va. 2016). "A waiver may be express or may be inferred from actions or conduct, but all of the attendant facts, taken together, must amount to an intentional relinquishment of a known right." *Id.* Again, Corotoman raised the overblasting issue with the contractor as the project was ongoing, before the point in the project that overblasting work would have begun. That is inconsistent with an intentional relinquishment of the right.

  The undisputed facts establish that the Airport Authority breached the terms of the Settlement Agreement. The Airport Authority has not put forth sufficient evidence to permit a factfinder to conclude that any of its proffered defenses apply. Therefore, the Court finds that Corotoman is entitled to summary judgment on the question of breach of contract.

### B. *Damages and Specific Performance*

As an initial matter, the Court finds that Corotoman has presented sufficient evidence of injury to survive the Airport Authority's motion for summary judgment. The License and Work Agreement itself provides that "any breach by the Airport Authority occurring after commencement of the Project will cause significant harm to Corotoman, including lost profits, revenue, and rents, the loss of the use of Corotoman's property; potential third-party litigation costs, including attorney's fees and court costs, and annoyance and inconvenience." (License and Work Agreement at ¶15) (Document 148-2.) The negotiations regarding the property swap suggested that Corotoman would have more useful contiguous parcels following the exchange. The existence of *any* injury does not, however, establish the proper measure of damages or the availability of specific performance as a form of relief.

In West Virginia, "[s]pecific performance of a contract is not a matter of right, but rests in the sound discretion of the court, to be determined from all the facts and circumstances of the case." Syl. Pt. 2, *Allegheny Country Farms, Inc. v. Huffman*, 787 S.E.2d 626, 627 (W. Va. 2016). Specific performance is generally an equitable remedy appropriate when a party cannot be adequately compensated with money damages. *Id.* at 631 (citing Restatement Second of Contracts § 360 (1981)). "It is well settled that courts of equity have the discretionary power, when the circumstances warrant it, to refuse specific performance of contracts." *Johnson v. Ohio River R. Co.*, 56 S.E. 200, 204 (W. Va. 1906) (denying specific performance where "the enforcement of the covenant is virtually the exaction of a penalty, imposing a burden upon the defendant, without conferring any corresponding benefit, if, indeed, any benefit at all, upon the plaintiff").

Specific performance is an equitable remedy, and the Court does not have sufficient evidence to fairly evaluate the equities at the summary judgment stage. While specific performance is often appropriate in real estate contracts because of the unique nature of real property, Corotoman has presented little factual evidence regarding the need for specific performance in this case. The record does not include evidence of the previous or future use of the property, its anticipated or estimated value prior to the obstruction removal project,[4] in its current condition, or after full performance of the contract, or the reasons this property is unique for Corotoman's purposes. In *Allegheny Country Farms, Inc. v. Huffman*, wherein the West Virginia Supreme Court found specific performance appropriate, the Huffmans and Allegheny Country Farms owned adjoining properties, and the Huffmans contracted to convey a small strip of property that separated the Allegheny land from a public road. 787 S.E.2d 626, 634 (2016). Although it was not discussed in extensive detail, it is obvious in those circumstances why specific performance, rather than monetary damages, was appropriate: the strip of land had relatively low market value but was of particular utility for Allegheny Country Farms. The evidence presented does not permit the Court to make a similar analysis regarding Corotoman's property.

Furthermore, with respect to the land swap, it is not clear that the Court could order specific performance. The FAA is not a party to this suit, and neither the Court nor the Airport Authority can convey certain property absent its approval pursuant to federal regulation. 14 C.F.R. § 155.1 *et seq.*[5] It is not clear whether the FAA continues to object to the property exchange and whether any such objection could be overcome.

---

4 The Airport Authority obtained an appraisal, which Corotoman rejected as undervalued in 2011.
5 That the Airport Authority cannot convey the property without FAA approval does not mitigate its breach of the contract. It agreed to perform the property exchange without either including a specific condition precedent or obtaining the necessary approval prior to obligating itself.

17

Therefore, the Court finds that any determination as to whether to award specific performance and/or what constitutes the proper measure of damages cannot properly be made prior to trial in this case. In general, "[i]t is a fundamental principle of the law of contracts that a plaintiff is only entitled to such damages as would put him in the same position as if the contract had been performed." *Milner Hotels, Inc. v. Norfolk & W. Ry. Co.*, 822 F. Supp. 341, 344 (S.D.W. Va. 1993) (Faber, J.), *aff'd*, 19 F.3d 1429 (4th Cir. 1994). "To entitle plaintiff to recover substantial damages for breach of contract, where the loss is pecuniary and susceptible of proof with approximate accuracy, he[/she] must establish the quantum of damages with reasonable certainty." Syl. Pt. 10, *Miller v. WesBanco Bank, Inc.*, 859 S.E.2d 306, 311 (W. Va. 2021). The parties have put forth evidence as to the cost of specific performance, but little evidence as to the *value* of specific performance for Corotoman, any alternative measure of damages, or the reason(s) monetary damages would be inadequate to compensate Corotoman for the breach. Thus, Corotoman's motion for summary judgment will be denied on the issue of specific performance.

## CONCLUSION

Wherefore, after thorough review and careful consideration, the Court **ORDERS** that *Defendant Central West Virginia Regional Airport Authority's Motion for Summary Judgment* (Document 146) be **DENIED**. The Court further **ORDERS** that Plaintiff Corotoman's *Motion for Partial Summary Judgment for Breach of Contract and Specific Performance Against Central West Virginia Regional Airport Authority, Inc.* (Document 148) be **GRANTED** as to the issue of breach of contract and **DENIED** as to the issue of specific performance.

The Court further **ORDERS** that the parties (including cross-defendant Bailey & Wyant) engage in a second good-faith mediation with Magistrate Judge Omar J. Aboulhosn prior to the

January 26, 2023 pretrial conference. Counsel for all parties are **ORDERED** to contact Judge Aboulhosn's chambers promptly for further instructions and scheduling.

The Court **DIRECTS** the Clerk to send a copy of this Order to Magistrate Judge Aboulhosn, to counsel of record, and to any unrepresented party.

ENTER: December 13, 2022

IRENE C. BERGER
UNITED STATES DISTRICT JUDGE
SOUTHERN DISTRICT OF WEST VIRGINIA