**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA**

**CHARLESTON DIVISION**

COROTOMAN, INC.,

                Plaintiff,

v.                                   CIVIL ACTION NO.   2:21-cv-00545

CENTRAL WEST VIRGINIA REGIONAL
AIRPORT AUTHORITY, INC., et al.,

                Defendants.

**MEMORANDUM OPINION AND ORDER**

The Court has reviewed *Defendant Central West Virginia Regional Airport Authority's Brief Submitted in Lieu of Trial* (Document 191), *Plaintiff Corotoman, Inc.'s Trial Submission Against Defendant Central West Virginia Regional Airport Authority, Inc. on the Issue of Damages* (Document 192), *Plaintiff Corotoman, Inc.'s Response to Defendant Central West Virginia Regional Airport Authority, Inc.'s Brief Submitted in Lieu of Trial on the Issue of Damages* (Document 201), *Defendant Central West Virginia Regional Airport Authority's Response in Opposition to Plaintiff's Trial Submission* (Document 202), *Defendant Central West Virginia Regional Airport Authority's Reply in Support of Its Brief in Lieu of Trial* (Document 203), and *Plaintiff Corotoman, Inc.'s Reply in Support of Its Trial Submission Against Defendant Central West Virginia Regional Airport Authority, Inc. on the Issue of Damages* (Document 204).   The Court has also reviewed all exhibits.

1

In addition, the Court has reviewed *Plaintiff Corotoman, Inc.'s Request for Judicial Notice in Support of Plaintiff's Trial Submission* (Document 193), *Defendant Central West Virginia Regional Airport Authority's Opposition to Plaintiff's Request for Judicial Notice in Support of Plaintiff's Trial Submission* (Document 200).

The Court has further reviewed *Plaintiff Corotoman, Inc.'s Motion for Judgment on Partial Findings on the Minimum Amount of Damages* (Document 190) and *Defendant Central West Virginia Regional Airport Authority's Opposition to Plaintiff Corotoman's Motion for Judgment on Partial Findings on the Minimum Amount of Damages* (Document 199).   As this motion was submitted at the same time as the parties' primary briefing, the Court will not address it separately.

## PROCEDURAL HISTORY

The Plaintiff, Corotoman, Inc., is a development company that owned property in the vicinity of Yeager Airport in Charleston, West Virginia.   Its president is John Wellford.   The Central West Virginia Regional Airport Authority (Airport Authority) operates Yeager Airport. The airport director was Richard Atkinson from 1999 through July 2015.   The Airport Authority Board of Directors consists of unpaid members appointed by local and regional governmental bodies.   The President of the Board of Directors at all relevant times was R. Edison Hill.   The Airport Authority was represented by attorney Charles (Chuck) Bailey and his firm of Bailey & Wyant, as outside counsel, at all relevant times.

This suit was originally filed as an adversary proceeding in Corotoman's bankruptcy case in the Bankruptcy Court for the Southern District of West Virginia.   (2:19-BK-20134; 2:19-AP-2013.)   The Court granted a motion to withdraw the reference on September 24, 2021.   (Mem. Op., Document 9 in 2:21-mc-120.)   The case centers on a contract wherein Corotoman agreed to

grant the Airport Authority an avigation easement and right to access its property to remove a knoll that interfered with Airport operations, in return for money and the Airport Authority's agreement to overblast to a specified level.   The parties also agreed to exchange certain parcels of property. The Court previously ruled on motions to dismiss and motions for summary judgment, and the Plaintiff reached a settlement with Bailey & Wyant, PLLC, as to a cross claim.   As a result of those previous rulings and resolutions, the sole remaining issue is damages arising from the Airport Authority's breach of the contract.

The matter was scheduled for a bench trial.   During a pretrial conference on January 26, 2023, the parties agreed to file written submissions and evidence on the issue of damages rather than presenting evidence in court.

## FINDINGS OF FACT

The Court's previous opinions resolving motions to dismiss and for summary judgment exhaustively outline the facts surrounding the contract and the parties' actions and communications entering into it, as well as the breach.   Here, the Court will provide a brief summary to provide context for the findings related to damages.

The Airport Authority sought to remove a knoll located on property near the airport because it interfered with certain flights.   It obtained a grant from the FAA and contracted with L.R. Kimball & Associates to assist in the project, including acquiring the parcels of property. Corotoman was the largest single property owner in the obstruction removal area.   Beginning in 2011, Mr. Atkinson engaged in negotiations with Mr. Wellford of Corotoman, seeking to purchase the Corotoman properties on behalf of the Airport Authority.   The Airport Authority obtained an appraisal in 2010, valuing the Corotoman property at $186,000.   The Airport Authority offered to

3

purchase the Corotoman property for $260,125.00 on February 24, 2011, in an effort to avoid condemnation proceedings.    Mr. Wellford rejected the offer, which he considered too low. Ultimately the Airport Authority and Corotoman entered into a Settlement Agreement in July 2012.

The Settlement Agreement provided for execution of a related License and Work Agreement with detailed requirements related to the work to be performed on the property. Section Two of the Settlement Agreement, titled "Nature of Agreement," outlines the contours of the agreement:

> [I]n lieu of condemnation, Corotoman agrees to grant a license for certain work to be performed on certain real property currently owned by Corotoman and to grant an easement for the passage of aircraft over certain real property.   As fair and just compensation for said rights, including severance damages to Corotoman's remaining property rights, the Airport Authority agrees to perform certain work on certain real property owned by Corotoman, exchange certain other real property with Corotoman, and reimburse Corotoman for the severance damages caused by the Airport Authority's acquisition of property rights under this Settlement Agreement.

(Def.'s Ex. E, Settlement Agreement at § 2) (Document 194-7.)   Section 3.01 provides for execution of the License and Work Agreement and requires that the "Project shall be completed in strict accordance with the Grading and Construction Plans, Specifications, and Schedules" attached to the Agreement.   (*Id.* at § 3.01.)   Sections 3.02 and 3.03 provide for the conveyance of properties described in exhibits to the Agreement to the respective parties.   Section 3.04 requires Corotoman to grant the Airport Authority an avigation easement "[c]ontingent upon the exchange of real property set forth in Paragraphs 3.02 and 3.03."   (*Id.* at § 3.04.)   Section Four provides for execution and delivery of the deeds and avigation easement at a Closing to occur

4

within 60 days of execution of the Settlement Agreement.   Section 7.07 contains a force majeure clause providing for the extension of time during certain delays or hindrances and contains the parties' agreement that "[i]n no event shall financial inability or acts or omissions within the control of the party seeking an excuse or extension be a cause for excuse or extension hereunder." (*Id.* at § 7.07.)   Section 7.08 provides: "Each party shall perform all obligations required by it under this Settlement Agreement only after obtaining all required governmental licenses, permits, and approvals, and thereafter in compliance with all such licenses, permits, and approvals, and otherwise in compliance with all applicable constitutional provisions, laws, rules, regulations, and directives of authorities of competent jurisdiction."   (*Id.* at § 7.08.)   Section 7.09 consists of a severability provision.

The License and Work Agreement includes specific terms related to the work to be performed.   It contains language requiring the Airport Authority to overblast at least 35 feet below the planned final grade and specifying that the finished grade be at least 10 feet below the elevation of the avigation easement.   Paragraph 15, entitled "Effect of Breach" provides as follows:

> Failure by the Airport Authority to strictly abide by the terms and conditions set forth in this Work Agreement shall constitute a material breach of the Agreement.   Failure to timely commence the Project shall terminate this Work Agreement and entitle Corotoman to retain any payments due and payable under the Settlement Agreement.   The parties acknowledge that any breach by the Airport Authority occurring after commencement of the Project will cause significant harm to Corotoman, including lost profits, revenue, and rents; loss of the use of Corotoman's property; potential third-party litigation costs, including attorney's fees and court costs; and annoyance and inconvenience.   Therefore, in event of a breach occurring after commencement of the Project, Corotoman may, in its discretion and as the circumstances reasonably dictate, revoke the License granted herein and/or seek the greater of either (1) actual compensatory, consequential, and/or incidental damages or (2) liquidated damages in the amount of ten

> thousand dollars ($10,000) per breach.   These remedies are cumulative, and a waiver, release, or settlement of one breach shall not operate as a waiver, release, or settlement of any other breach. Notwithstanding anything in this Paragraph to the contrary, Corotoman shall release the Airport Authority from any and all liability for liquidated damages if the Airport Authority requires all of its contractors and subcontractors to pay directly to Corotoman, as a third-party beneficiary, any liquidated damages caused by the acts or omissions of that contractor or subcontractor. Notwithstanding any breach by either party of this Work Agreement, the Settlement Agreement shall remain in force and effect to the fullest extent possible.   Failure to complete the Project contemplated by this Work Agreement shall not affect the provisions of the Settlement Agreement regarding mutual release of prior claims and future condemnation of Corotoman's real property.

(License and Work Agreement at ¶ 15) (Document 194-11.)

The Grading and Construction Plans, Specifications, and Schedules did not include the overblast work.   Corotoman reviewed those plans but did not raise concerns regarding the overblast until after the knoll removal work was partially completed.   The overblast would have taken place after the initial blasting and fill removal resulted in the grade required for the avigation easement.   Additional drilling and blasting to the overblast depth would then loosen the material. The contractor expressed concerns regarding utility lines in the area, as well as potential damages to neighboring property from the blasting.   Mr. Wellford and Mr. Atkinson sought to negotiate a resolution, but the issue remained unresolved when Mr. Atkinson left the Airport Authority in July 2015.   The obstruction removal project was completed around November 2015.

The Airport Authority never performed the overblast requirement.   The property transfers and conveyance of the avigation easement also did not occur, although the Airport Authority has utilized the airspace since completing the obstruction removal project.   The proposed land exchange would require FAA approval, and the FAA refused to grant that approval.   The Court

6

granted summary judgment for Corotoman on the issue of breach of contract, concluding that the Airport Authority had breached the Settlement Agreement and License and Work Agreement by failing to complete the overblast and the property swap.

Both parties have submitted expert reports regarding the cost to complete the overblast requirement.   Corotoman's expert, David B. Sharp, P.E., of Potesta & Associates, opined that the cost of completing the 35-foot overblast would be $14,659,351, updated to reflect increased costs from an original estimate of $12,859,080.00.   (Pl.'s Ex. F. & G) (Documents 192-6 & 192-7.) The updated estimate does not detail the line-item expenses.   In the original report, the largest single line item is $6,600,000 for "Unclassified Excavation (incl. loading, transporting in on-road trucks to a disposal site within a 2 mi. radius, dumping and compacting)."   (Sharp Rep. at 6, Document 192-7.)   That line item, along with costs for permitting for a disposal area and landowner fees for a fill disposal area, were excluded from the cost estimate for the Airport Authority's expert.   The Airport Authority's expert, Dr. Makarand Hastak, PHD, PE, CCP, CRIS, opined that Mr. Sharp failed to properly consider the shrink/swell of the material.   He concluded that "there may not be significant need to remove excess material," omitted the unnecessary costs from Corotoman's expert report, and estimated a total project cost of $4,381,080.   (Hastak Rep., att'd as Def.'s Ex. R) (Document 194-20.)   The Plaintiff did little to justify its expert's higher estimate, and the Court finds that Dr. Hastak's critique is well-founded.[1]

Mr. Wellford submitted a declaration dated March 7, 2023, detailing Corotoman's previous development projects in North Gate, the area including the property at issue, and his views on the

---

[1] Indeed, because the contract calls for a 35-foot overblast but does not specify fill removal or describe the final condition of the land, it is not clear to the Court that the Airport Authority would be obligated by the contract to complete those tasks even if necessary to achieve the result desired by Corotoman.

value and development potential of the property.   He cites previous sales of two North Gate properties, one in 2007 and one in 2013, for the proposition that Corotoman could have expected a price of $10 per usable square foot.   He also offers calculations of the flat square footage that would have been created by the excavating and use of fill material on adjoining properties following the land swap to conclude that the property would have been worth more than $18,000,000.[2]

The parties contest the admissibility of much of Mr. Wellford's declaration.   The Court finds that the Wellford declaration does not lay a sufficient foundation to support the opinions regarding the potential square footage and value of the property following a property swap, overblasting, excavation, fill, and leveling.   It also presents improper expert testimony. Although "Courts indulge a common-law presumption that a property owner is competent to testify on the value of his own property," Mr. Wellford's proposed testimony goes far beyond the typical property owner offering an estimate of his property's value.   *Christopher Phelps & Assocs., LLC v. Galloway*, 492 F.3d 532, 542 (4th Cir. 2007).   His proposed testimony addresses the potential value of his property following substantial changes.   It is not based on his own perceptions, but on purported specialized knowledge as a developer.   *See, e.g.*, *Blake v. Columbia Gas Transmission, LLC*, No. CV 3:19-0847, 2021 WL 4255619, at *2 (S.D.W. Va. Sept. 17, 2021) (Chambers, J.), *reconsideration denied,* No. 3:19-859, 2021 WL 5890669 (S.D.W. Va. Dec. 13,

---

2 One reason expert testimony must be disclosed in advance is to ensure that it is tested through the adversarial process to ensure its accuracy and credibility.   Mr. Wellford indicates that "Corotoman would own more than 15 acres of contiguous and perfectly flat property" had both the overblast and property swap been performed.   (Wellford Dec. at ¶12.)   He then calculates the flat square footage, which forms the basis of his value estimate, based on the excavation and fill material.   He states that "the total amount of flat and usable square footage after excavating 35 feet would be 1,809,245."   (*Id.*)   One acre contains 43,560 square feet.   1,809,245 square feet would equal more than 41 acres of land.   Mr. Wellford's declaration would not be credible evidence as to the projected property value even if it had been properly disclosed.

2021) (finding that "a loss of value caused by a specific factor…entails an analysis beyond the knowledge of what a typical property owner or lay witness possesses" and refusing to permit undisclosed expert testimony addressing the "valuation of certain property both before and after changes…").  Mr. Wellford was not disclosed as an expert, and his opinions regarding the value of the property were shared only after the close of discovery.  Therefore, the Court will not consider his declaration as to those matters outside his personal, direct knowledge.  The request for judicial notice as to the deeds submitted will be granted to the extent they will be permitted as part of the record, though they are of limited evidentiary value without additional contextual evidence explaining how those properties compare to the property at issue.

The 2010 appraisal noted conversations with Mr. Wellford regarding the development potential of the property, including Mr. Wellford's "off-hand remark…that he can do the cut and fill necessary to create usable land out of the affected area for about $2/SF."  (Zdrojewski Appraisal at 22) (Document 194-2.)  The appraiser also evaluated previous sales within North Gate, noting relatively slow sales of property during the history of Corotoman's ownership and development.  "With the exception of one very small tract of land that sold in 2007 for $433,880/acre all of the sales within NorthGate since 2000 have sold for $73,145/acre to $294,360/acre."  (*Id.*)  Because the appraiser concluded that development of the parcel was "not likely to occur until well into the future," he considered sales comparisons for the property in its current condition, rather than development value.  (*Id.* at 32.)  The appraiser noted a unit price of about $200,000/total acre for prior sales of "developed tracts with roads and utilities," but concluded that development of the parcel at issue was not economically feasible at the time, and those prior sales were therefore not comparable.  (*Id.* at 48.)  Following review of other local

9

comparable sales of property available for development that were in similarly undeveloped condition, the appraiser arrived at a value of $10,000 per acre.

## CONCLUSIONS OF LAW

Corotoman argues that it is entitled to a minimum of $4,381,080.00 in damages, based on the Airport Authority expert's opinion regarding the cost to perform the overblast requirement.   It contends that "[b]ut for the Airport Authority's breach, Corotoman would have been in possession of more than fifteen (15) acres of contiguous, developable land near downtown Charleston by January 1, 2015."  (Corotoman Brief at 1-2.)  It states that, absent the overblast provision, it would have negotiated other terms or hired an appraiser to assist during the condemnation process if no acceptable terms were reached, emphasizing that it viewed the Airport Authority's 2011 offer of $260,125.00 as insufficient.   It argues that, under the terms of the License and Work Agreement, it is entitled to choose whether to seek actual, compensatory, and/or incidental damages or liquidated damages, and it has chosen to seek compensatory damages equal to the cost to complete the overblast requirement.   In the event it had sought liquidated damages, however, it contends that "one possible interpretation of this [liquidated damages] provision is that per breach means per day because the License and Work Agreement contains a time is of the essence clause."  (*Id.* at 24.)

Corotoman further contends that any argument of gross disproportionality between the cost of completion and the lost value is inapplicable because West Virginia has not expressly adopted such a rule, and the Airport Authority would bear the burden of proving that the cost is disproportionate.   It contends that the Zdrojewski appraisal has no evidentiary value because it is out of date and assessed the value of the property in its condition in 2010 – not its condition

10

following the obstruction removal or the condition following the overblast or land exchange contemplated by the contract.

The Airport Authority contends that it has paid Corotoman substantial sums of money, including an initial $250,000 as set forth in the Settlement Agreement, but received nothing in return because no deeds changed hands and the avigation easement was never recorded. The Airport Authority argues that the cost of performing the overblast is not the proper measure of damages because it would be grossly disproportionate to the value of the land. Instead, it contends that damages should be measured by "the difference in value between what should have been built (land overblasted) and what was built (land as is)." (Airport Authority Brief at 2.) The Airport Authority contends that an award of the cost to perform the overblast would enrich Corotoman, placing it in a better position than it would be in had the contract terms been completed as agreed upon. Because Corotoman failed to present evidence establishing the increase in value that would have resulted from overblasting, the Airport Authority argues that it has not proven damages. It rejects Corotoman's argument that the Airport Authority bears the burden of proving the diminution in value. It contends that expert evidence would be required to demonstrate the difference in value had the property been overblasted. Therefore, the Airport Authority argues that Corotoman is entitled to only $10,000 in liquidated damages.

Both parties agree that the contract at issue is a construction contract, and their discussion of the appropriate measure of damages begins with that assumption. The Court is less convinced that the Settlement Agreement and License and Work Agreement is properly construed, in its entirety, as a construction contract. The Settlement Agreement describes the nature of the agreement. The agreement was entered into to avoid condemnation proceedings whereby the

11

Airport Authority would have gained possession of Corotoman's property.  It provided for an easement, monetary payments, the exchange of real property, and work performed on the property. Corotoman has not sought damages for the failure to exchange certain parcels of property.  The portion of the contract at issue involves overblasting of the property.  Therefore, while the Court will consider the precedent relied on by the parties related to construction contracts, the Court will also be guided by general principles applicable to contractual damages under West Virginia law.

"It is axiomatic that the purpose of damages for breach of contract is to place the injured party in the position he would have occupied had the defendant performed." *TransDulles Ctr., Inc. v. USX Corp.*, 976 F.2d 219, 226 (4th Cir. 1992); *see also Miller v. WesBanco Bank, Inc.*, 859 S.E.2d 306, 335 (W. Va. 2021) ("It is a fundamental principle of the law of contracts that a plaintiff is only entitled to such damages as would put him in the same position as if the contract had been performed.").  "In an action for breach of contract to perform specified work, the measure of damages is the actual loss suffered by the injured party directly flowing from such breach."  Syl. Pt., *Horn v. Bowen*, 67 S.E.2d 737, 737 (W. Va. 1951).  Damages may not exceed the amount necessary to fairly compensate the plaintiff for the loss sustained.  *Miller*, 859 S.E.2d at 335; *Horn*, 67 S.E.2d at 739.  Plaintiffs must "establish the quantum of damages with reasonable certainty," and are entitled to only nominal damages if they fail to provide "sufficient data…whereby a jury may definitely ascertain the compensation due for the breach."  Syl. Pt. 10, *Miller*, 859 S.E.2d at 311.

The West Virginia Supreme Court has addressed the measure of damages in construction contracts.  In a 1967 case involving a contract to build a home, the purchaser alleged various flaws with the construction, including leaking gutters, improperly spaced foundation supports, and a well

that did not produce adequate water flow, among others.   *Steinbrecher v. Jones*, 153 S.E.2d 295, 299–300 (W. Va. 1967).   The Court explained:

> As a general rule, the proper measure of damages in such cases involving building contracts is the cost of repairing the defects or completing the work and placing the construction in the condition it should have been in if properly done under the agreement contained in the building contract. The alternate rule in some states relating to the measure of damages as being the difference in value between what is built and what was supposed to have been built, sometimes applied where extensive reconstruction is necessary at a cost grossly disproportionate to the value of the structure, is not involved under the facts presented by the evidence produced at the trial held in this present case, so we do not need to discuss it.

*Id.* at 304.   In a 1983 case, the Court again noted the general rule that damages in building contract cases is based on the cost to repair or complete the work, as well as the alternative rule measuring the "difference in value between what is built and what was supposed to have been built."   *Trenton Const. Co. v. Straub*, 310 S.E.2d 496, 499 (W. Va. 1983).   As in *Steinbrecher*, however, the cost of correcting the flaw in *Trenton Construction* (a missing moisture barrier) was far less than the value of the home, and the Court concluded that the cost "is clearly not disproportionate to the value of the Straubs' home and the trial court was correct in applying the cost of repair rule."   *Id.* The West Virginia Supreme Court of Appeals has not addressed a case in which the cost of repair or completion was disproportionate to the difference in value, and therefore has not directly addressed the proper measure of damages in those circumstances.

The Restatement likewise provides alternative means of recovery for breach of a construction contract, stating that where a breach results in defective or unfinished construction, the plaintiff "may recover damages based on (a) the diminution in the market price of the property caused by the breach, or (b) the reasonable cost of completing performance or of remedying the

defects if that cost is not clearly disproportionate to the probable loss in value to him." Restatement (Second) of Contracts § 348(2) (1981).  The Restatement explains that where the "cost to remedy the defects will be clearly disproportionate to the probable loss in value to the injured party" such that the injured party would receive a windfall, "[s]uch an award will not be made."  *Id.* at cmt. c. "If an award based on the cost to remedy the defects would clearly be excessive and the injured party does not prove the actual loss in value to him, damages will be based instead on the difference between the market price that the property would have had without defects and the market price of the property with the defects."  *Id.*

Other secondary sources and legal encyclopedias provide similar guidance.  "The measure of damages for breach of a contract, the performance of which would result in the betterment or improvement of land, may be the difference in the rental value of the land, the difference in value of the land, or the cost of making the improvement."  25 C.J.S. Damages § 124.  In discussing the differing analytical modes for applying cost of completion or diminution in value to cases involving the breach of a construction contract, the A.L.R. concluded that "[w]hat seems to be at work is a judicial effort to find the just solution for the particular case by balancing the opposing policy objectives of giving the owner substantially what the contract requires, but doing so without exacting a forfeiture from the contractor."  41 A.L.R. 4th 131 (originally published in 1985).

In an opinion the Court found instructive, the Eighth Circuit addressed the measure of damages where an airplane lessee breached a contract by failing to keep maintenance and repair records required for regulatory compliance.  *BLB Aviation S.C., LLC v. Jet Linx Aviation, LLC*, 808 F.3d 389, 391 (8th Cir. 2015).  The lessor sought damages equaling the cost to re-do the maintenance, but there was evidence establishing that other, less costly, alternatives were available

14

to remedy the breach and bring the aircraft back into regulatory compliance.  *Id.* at 394 (also noting that the aircraft had been sold and the lessor would therefore not be performing any repairs). The Eighth Circuit, applying Nebraska law, explained that the "cost of repair supplies the default measure unless the breaching party shows that economic waste would result," in which case diminution of value may be applied.  *Id.* at 393.   Because the cost to repair, as presented by the plaintiff based on the cost to redo the maintenance work, "would result in windfall and, therefore, in economic waste," the Eighth Circuit found that "[d]iminution in value thus provides the appropriate measure of damages."  *Id.* at 394.   Neither party had "presented non-speculative evidence of any diminution in value for either aircraft," and, because "the burden of proving the amount of damages with sufficient certainty fell to [the plaintiff," the Eighth Circuit affirmed the district court's refusal to award damages following a bench trial.  *Id*. at 394–95.

The Airport Authority has consistently argued that the cost to complete the overblasting requirement would be disproportionate to the value of the property.  Neither party presented current, credible, admissible evidence of the value of the property in its current state or its projected value following overblasting.  However, the Court finds that the 2010 appraisal suffices to establish that the cost of completion as estimated by the expert reports of either party would be grossly disproportionate to the value of the land.  The 2010 appraisal is quite detailed.   It includes comparisons to similar raw land, as well as development properties sold following improvements.[3] The range of sales outlined in the appraisal reflects prices closer to $200,000/acre for developed,

---

3 Those comparisons—including review of the 2007 sale referenced in the Wellford declaration—demonstrate that Mr. Wellford cherry-picked particularly successful sales with outlier prices within the North Gate development to submit to the Court.   The Court therefore does not find the 2007 and 2013 sales he highlights to be useful comparators, and instead relies on the discussion within the appraisal report for general information on property values in the Charleston area.

flat property with access to roads and utilities.[4]   The value of the property without such improvements was estimated at approximately $10,000 per acre.[5]   While the 2010 appraisal is too outdated, both in terms of current property values and the current condition of the property, to establish a current value of the property, it does provide insight into the approximate potential value.   The information regarding property values supports the Airport Authority's contention that an award of more than $4,000,000 would constitute a windfall for Corotoman.

In addition, Mr. Wellford, as the principal, president, and sole owner of Corotoman, indicated in his declaration that, without the property swap, overblasting and development would be impractical.

> As it sits, the property in question is checkerboarded in nature making it extremely difficult if not impossible to develop. Corotoman owning this property in a contiguous manner makes it significantly more valuable because then anyone could develop the entire property.   It is impractical to overblast a mountain without doing it all at once.   *You simply could not overblast and reduce the height of the mountain in a checkerboarded fashion along property lines.*

(Wellford Dec. at ¶ 19) (emphasis added).   The property swap cannot occur because the FAA refused to approve the transfer of Airport property.   Corotoman elected not to present evidence or seek damages for the Airport Authority's breach of contract related to the property swap.   The cost to complete an overblast that is impractical and will not be performed is not an accurate

---

4 The Wellford declaration indicates that "[m]ost of the property sold by Corotoman in North Gate occurred from 2001-2007.   The last property Corotoman sold in North Gate was in 2013."   (Wellford Dec. at ¶ 7.)   The properties Mr. Wellford offers as comparable were sold in 2007 and 2013.   Therefore, concerns about the currentness of the comparable sales discussed in the 2010 appraisal report are diminished, given that Corotoman relies on North Gate sales as comparable properties.

5 Corotoman has not presented evidence that would permit the Court to understand how the property at issue, following overblasting, would compare to the development-ready parcels sold and considered as comparable properties.   Thus, the Court has no information to determine where the property falls between the approximate value for raw land and the value for flat, development-ready property with utilities and road access.

reflection of the damages actually incurred as a result of the breach.   Awarding damages on that basis would instead serve only to penalize the Airport Authority and act as a windfall to Corotoman, rather than placing Corotoman in the position it would be in absent the breach.

"As a federal court sitting in diversity, our role is to apply governing West Virginia contract law, or, if necessary, predict how the state's highest court would rule on an unsettled issue." *McFarland v. Wells Fargo Bank, N.A.*, 810 F.3d 273, 279 (4th Cir. 2016) (internal quotation marks omitted).   The West Virginia Supreme Court of Appeals has approvingly discussed application of the diminution in value measure of damages where the cost of repair is disproportionate but has not addressed a case presenting the issue.   It has rejected contractual damages that would be punitive or grossly disproportional in other circumstances, holding "[a] clause for damages in a contract is a penalty rather than a liquidated damage provision when the amount is grossly disproportional in comparison to the damages actually incurred."   Syl. Pt. 4, *Wheeling Clinic v. Van Pelt*, 453 S.E.2d 603, 604 (1994).   The West Virginia Supreme Court has also held, in the context of tort damages, that "damages awarded for cost of repair [to residential real property] must be reasonable in relation to its fair market value before it was damaged" and "may be found to be unreasonable as a matter of law if unreasonably disproportionate to the fair market value of the property prior to the damage."   Syl Pt. 5, *Brooks v. City of Huntington*, 768 S.E.2d 97, 99 (W. Va. 2014).   The combination of persuasive out of state precedent, secondary authorities, and the general principles of damages law in West Virginia convincingly support the conclusion that the West Virginia Supreme Court would apply the diminution in value measure rather than award disproportionate windfall damages.   The Court therefore concludes that the cost of repair is not the appropriate measure of damages.

The parties dispute, to some degree, who bears the burden of establishing disproportionality and of establishing the diminution in value.   Given the Court's finding that the Airport Authority sufficiently established disproportionality, it is unnecessary to determine precisely what burden a defendant bears in invoking or establishing the applicability of the alternative measure of damages.[6]   West Virginia law is clear that the plaintiff, or the party seeking damages, bears the burden of proving damages, and contract damages "must be proved with reasonable certainty."   Syl. Pt. 4, 7, *Taylor v. Elkins Home Show, Inc.*, 558 S.E.2d 611, 613 (W. Va. 2001).

Corotoman's evidence on damages is limited to its expert report estimating that it would cost more than $14,000,000 to complete the 35-foot overblast.   While the Court's finding that the cost of completion is not the appropriate measure of damages limits the need to closely evaluate the evidence relating to the cost of completion, the Court notes that even Corotoman does not meaningfully defend its expert's cost estimate.   The Sharp report lists line items with costs but does not detail the basis of those figures.   It also includes certain costs that may not be necessary or that were not included in the contract as the Airport Authority's responsibility.   Mr. Wellford's declaration indicates that Corotoman contemplated using material from the overblast area as fill for surrounding properties to create additional flat land for development.   The contract requires only that the Airport Authority perform the 35-foot overblast, not that it excavate or finish the site

---

6 For practical purposes, when it has become clear that disproportionality is at issue, both parties would be well-advised to produce evidence as to both measures of damages.   Courts do not typically have the opportunity to rule on the proper measure of damages prior to completion of discovery.   Thus, while a rule like that discussed by the Eighth Circuit requiring a defendant to prove disproportionality has some appeal, simply requiring a defendant to raise the issue and put the plaintiff on notice that a cost of repair measure may be contested as disproportionate would satisfy the need to ensure that the parties have the opportunity to conduct the relevant discovery and present evidence and argument to the court and/or jury.

to prepare it for development.   As such, costs related to excavation and finishing the surface of the site would presumably be borne by Corotoman.

As the Court noted in ruling on the motions for partial summary judgment, Corotoman provided little contextual information regarding the property and its anticipated use.   "The record does not include evidence of the previous or future use of the property, its anticipated or estimated value prior to the obstruction removal project, in its current condition, or after full performance of the contract, or the reasons this property is unique for Corotoman's purposes."   (Mem. Op. at 17) (Document 173.)   The Wellford declaration provides a bit of additional detail, describing North Gate as a "successful business development," and indicating that the parcel at issue was intended to be used for potential future development.   (Wellford Dec. at ¶¶ 6, 13, 14.)   The 2010 appraisal provides sufficient information as to the price per acre of comparable parcels of both raw and development-ready land to establish that more than $4,000,000 is grossly disproportionate to the value of the property but provides no appraisal of the land in its current condition or its anticipated value following the overblast.   Corotoman has still presented no admissible evidence as to the value of the property in its current state, whether it is suitable for any potential use, its projected value following overblasting, with or without the property swap, or any costs that would be incurred in bringing the property to a developable condition.   There is no evidence regarding road or utility access.   Even the exact acreage impacted by the knoll removal project is not set forth clearly in the record.   In short, the record is devoid of any evidence that would allow the Court to determine the diminution in value caused by the Airport Authority's breach.   "As such, any amount of damages…is mere speculation and fails under our rule which requires proof of damages

with reasonable certainty." *Taylor v. Elkins Home Show, Inc.*, 558 S.E.2d 611, 619 (W. Va. 2001).

The Airport Authority contends that Corotoman is entitled to liquidated damages as set forth in the License and Work Agreement.   Corotoman contends that it is free to choose whether to seek compensatory or liquidated damages and that it chose to seek compensatory damages. Paragraph 15 of the License and Work Agreement did, in fact, allow the Plaintiff to pursue ",,,the *greater* of either 1) actual compensatory, consequential, and/or incidental damages *or* 2) liquidated damages in the amount of ten thousand dollars ($10,000) per breach." However, given Corotoman's choice to pursue compensatory damages, the Court has no firm information regarding the amount of, or basis for, any liquidated damages that may have been claimed.   Accordingly, with no damages having been proven to a reasonable certainty, the Court finds that no damages should be awarded.

## CONCLUSION

Wherefore, after thorough review and careful consideration, for the reasons stated herein, the Court **FINDS** that Corotoman has not proven the amount of damages resulting from the Airport Authority's breach of contract.   The Court **ORDERS** that judgment be entered in favor of the Airport Authority.   The Court further **ORDERS** that *Plaintiff Corotoman, Inc.'s Request for Judicial Notice in Support of Plaintiff's Trial Submission* (Document 193) be **GRANTED**, that *Plaintiff Corotoman, Inc.'s Motion for Judgment on Partial Findings on the Minimum Amount of Damages* (Document 190) be **DENIED**, and that all other pending motions be **TERMINATED AS MOOT**.

The Court **DIRECTS** the Clerk to send a certified copy of this Order to counsel of record and to any unrepresented party.

ENTER:    July 27, 2023

IRENE C. BERGER
UNITED STATES DISTRICT JUDGE
SOUTHERN DISTRICT OF WEST VIRGINIA